753 S.E.2d 416

**Mildred H. SHATTO, Petitioner,**

v.

**McLEOD REGIONAL MEDICAL CENTER and Key Risk Management Services, Inc., Respondents,**

and

**Staff Care, Inc. and Travelers Insurance, Defendants.**

**Appellate Case No. 2011–201186.**

**No. 27341.**

Supreme Court of South Carolina.

Heard Oct. 2, 2013.

Decided Dec. 18, 2013.

472

Blake A. Hewitt and Margaret M. Bluestein, both of Bluestein, Nichols, Thompson & Delgado, LLC, of Columbia for Petitioner.

Walter H. Barefoot, of Florence, and Carmelo B. Sammataro, of Columbia, both of Turner, Padget, Graham & Laney, PA, for Respondents.

Justice KITTREDGE.

In this workers' compensation case, we granted a petition for a writ of certiorari to review the decision of the court of

appeals in *Shatto v. McLeod Regional Medical Center,* 394 S.C. 552, 716 S.E.2d 446 (Ct.App.2011). This case presents the familiar tension in the workers' compensation arena in distinguishing between an employee and an independent contractor. Petitioner Mildred H. Shatto sought workers' compensation benefits, claiming she was an employee of Respondent McLeod Regional Medical Center (McLeod Regional) when she fell in an operating room and was injured. McLeod Regional opposed the claim on the basis of Shatto's purported status as an independent contractor. The Workers' Compensation Commission (Commission) found that *every* factor of the common law employment analysis supported Shatto's contention of an employment relationship. The court of appeals reversed, finding that *every* factor of the common law employment analysis supported McLeod Regional's contention of an independent contractor relationship.

Because we find that the evidence, although not one-sided, preponderates in favor of an employment relationship, we reverse the court of appeals. We remand to the court of appeals to address McLeod Regional's additional assignment of error initially presented to, but not reached by, the court of appeals concerning whether Shatto's "idiopathic fall constitutes a compensable injury by accident arising out of and in the course and scope of [Shatto's] employment."

## I.

### FACTUAL/PROCEDURAL BACKGROUND

Petitioner Mildred H. Shatto is a certified nurse anesthetist. She has worked in the nursing profession for over twenty years, including a twenty-one year stint at a hospital in Pennsylvania. She moved to South Carolina to care for her sister and worked several short-term nursing jobs. After working as a nurse anesthetist in Charlotte, North Carolina for approximately five years, she sought an employment position through a nurse staffing agency, Defendant Staff Care, Inc.

Through Staff Care, Shatto was hired to work as a nurse anesthetist for McLeod Regional in Florence, South Carolina. Shatto did not have an express contract of employment direct-

ly with McLeod Regional. Instead there were two relevant contracts: Shatto's contract with Staff Care ("the Provider Agreement") and Staff Care's contract with McLeod Regional ("the Staffing Agreement").

On December 21, 2007, Shatto was helping anesthetize a patient in an operating room. In the process, Shatto fell and was injured. She was treated at McLeod Regional and was released from employment shortly after the injury.

Shatto brought workers' compensation claims against McLeod Regional and Staff Care. Staff Care answered with a general denial, and McLeod Regional initially admitted that Shatto was a hospital employee, but later amended its position and denied the existence of an employment relationship. The claims were consolidated, and the matter was heard by a single commissioner.

The single commissioner found that Shatto was an employee of McLeod Regional and that her injuries were compensable. McLeod Regional was ordered to pay Shatto's workers' compensation benefits.[1]

McLeod Regional appealed the single commissioner's decision, and the appellate panel affirmed the commissioner's decision in its entirety. McLeod Regional then appealed to the court of appeals, which reversed the Commission's finding and concluded that Shatto was an independent contractor— not an employee of McLeod Regional. The court of appeals did not reach the question of whether Shatto's injuries were compensable. The court of appeals remanded the case to the Commission to address Shatto's claim against Staff Care. We granted a petition for writ of certiorari to review the court of appeals' decision.[2]

---

1. As part of the commissioner's determination of an employer-employee relationship, he further determined that Shatto was entitled to benefits under the alternative theories of the borrowed servant doctrine and statutory employment doctrine. We need not reach the merits of these theories.

2. At oral argument the matter of appellate jurisdiction was raised in light of our decision in *Bone v. U.S. Food Serv.*, 404 S.C. 67, 744 S.E.2d 552 (2013). The parties contend that this Court has jurisdiction to hear this appeal and that *Bone* has no application. We agree. *Bone* addressed appealability under the predecessor to section 1–23–390 of the

## II.

## ANALYSIS

### Common Law Employment Test

 We are presented with the question of whether Shatto was, at the time of her injury, an employee of McLeod Regional or an independent contractor. "No award under the Workers' Compensation Law is authorized unless the employer-employee or master-servant relationship existed at the time of the alleged injury for which claim is made." *McLeod v. Piggly Wiggly Carolina Co.*, 280 S.C. 466, 469, 313 S.E.2d 38, 39 (Ct.App.1984) (citing *Cooper v. McDevitt*, 260 S.C. 463, 196 S.E.2d 833 (1973); *Alewine v. Tobin Quarries*, 206 S.C. 103, 33 S.E.2d 81 (1945)). "Because the question is jurisdictional, the Court may take its own view of the preponderance of the evidence." *Wilkinson ex rel. Wilkinson v. Palmetto State Transp. Co.*, 382 S.C. 295, 299, 676 S.E.2d 700, 702 (citing *S.C. Workers' Comp. Comm'n v. Ray Covington Realtors, Inc.*, 318 S.C. 546, 547, 459 S.E.2d 302, 303 (1995)).

 "Under settled law, the determination of whether a claimant is an employee or independent contractor focuses on the issue of control, specifically whether the purported employer had the *right* to control the claimant in the performance of his work." *Id.* (emphasis added) (citing *Ray Covington Realtors*, 318 S.C. at 547, 459 S.E.2d at 303; *Chavis v. Watkins*, 256 S.C. 30, 32, 180 S.E.2d 648, 649 (1971)). Under

South Carolina Code, which provided that in appeals from an administrative agency, such as the Commission, to the circuit court " '[a]n aggrieved party may obtain a review of any final judgment of the circuit court ... by appeal to the Supreme Court.' " *Bone*, 404 S.C. at 77, 744 S.E.2d at 557 (quoting S.C.Code § 1–23–390 (1986)). In 2006, as part of Act 387, which, among other things, mandated that appeals from the Commission go directly to the court of appeals, section 1–23–390 (2006), entitled "Supreme Court review," was amended to include review of decisions from the court of appeals. Section 1–23–390 concludes by providing that appeals from the court of appeals shall be pursued "by taking an appeal in the manner provided by the South Carolina Appellate Court Rules as in other civil cases." Rule 242(a), SCACR, authorizes this Court to issue a writ of certiorari "to review a *final decision* of the Court of Appeals." (emphasis added). The parties concede that the court of appeals' decision is final. Indeed, the rule speaks in terms of reviewing a "final decision" of the court of appeals, not a "final judgment."

the controlling common law rubric of the right of control, "the Court examines four factors which serve as a means of analyzing the work relationship as a whole: (1) direct evidence of the right or exercise of control; (2) furnishing of equipment; (3) method of payment; (4) right to fire." *Id.* (citing *Ray Covington Realtors,* 318 S.C. at 548, 459 S.E.2d at 303; *Chavis,* 256 S.C. at 32, 180 S.E.2d at 649; *Tharpe v. G.E. Moore Co., Inc.,* 254 S.C. 196, 200, 174 S.E.2d 397, 399 (1970)).

In *Wilkinson,* we overruled the analysis previously used in *Dawkins v. Jordan,* 341 S.C. 434, 534 S.E.2d 700 (2000), which mandated a finding of employment upon the mere presence of one of the factors favoring an employment relationship.[3] *See Wilkinson,* 382 S.C. at 300, 676 S.E.2d at 702 ("We overrule *Dawkins'* analytical framework, for it most assuredly skews the analysis to a finding of employment."). Thus, we "return[ed] to our jurisprudence that evaluates the four factors with equal force in both directions." *Id.* We now analyze the factors "in an evenhanded manner in determining whether the questioned relationship is one of employment or independent contractor." *Id.* at 307, 676 S.E.2d at 706.

It is instructive to review the facts and holding of *Wilkinson.* In *Wilkinson,* an employee of a trucking company desired to alter his status to that of an independent contractor. *Id.* at 298, 676 S.E.2d at 701. Wilkinson and the trucking company entered into a contract setting forth his preferred status as an independent contractor. *Id.* The parties honored the independent contractor arrangement in every respect, such that *each* of the four "right of control" factors favored the finding of an independent contractor relationship. *Id.* at 300, 676 S.E.2d at 702. In addition, Wilkinson carried the equivalent of his own worker's compensation coverage. *Id.* at 298, 676 S.E.2d at 701. We addressed "the existence of federal law in the trucking industry ... to support our ultimate determination as well as inform the narrow reach of

---

3. *Dawkins* held that " '[f]or the most part, any single factor is not merely indicative of, but in practice, virtually proof of, the employment relation; while, in the opposite direction, contrary evidence is as to any one factor at best only mildly persuasive evidence of contractorship, and sometimes is of almost no such force at all.' " 341 S.C. at 439, 534 S.E.2d at 703 (quoting 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law,* § 61.04 (2000)).

our decision." *Id.* at 304, 676 S.E.2d at 704. Moreover, Wilkinson owned his own tractor and "assumed responsibility for all costs, including fuel, oil, repairs, insurance, road taxes, fuel taxes, mileage taxes, and any weight violations." *Id.* at 303 n. 5, 676 S.E.2d at 704 n. 5.

As discussed below, we find that in this case the totality of the evidence preponderates in favor of a finding of employment between Shatto and McLeod Regional. We find that only one factor—method of payment—supports a finding of Shatto as an independent contractor with respect to McLeod Regional. We find the other factors, especially evidence of control and furnishing of equipment, compellingly support a finding of an employment relationship.

### Direct Evidence of the Right or Exercise of Control

■ While evidence of actual control exerted by a putative employer is evidence of an employment relationship, the critical inquiry is "whether there exists the *right and authority* to control and direct the particular work or undertaking." *Young v. Warr,* 252 S.C. 179, 189, 165 S.E.2d 797, 802 (1969) (emphasis added). "The right to control does not require the dictation of the thinking and manner of performing the work. It is enough if the employer has the *right* to direct the person by whom the services are to be performed, the time, place, degree, and amount of said services." *Nelson v. Yellow Cab Co.,* 343 S.C. 102, 110, 538 S.E.2d 276, 280 (Ct.App.2000) (emphasis added) (citing 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 61.01 (1999)), *overruled on other grounds by Wilkinson,* 382 S.C. at 300 n. 3, 676 S.E.2d at 702 n. 3.

■ We find the evidence of McLeod Regional's control of Shatto weighs heavily in favor of an employment relationship. Immediately upon assignment to McLeod Regional, Shatto executed a series of documents, which uniformly and compellingly speak to McLeod Regional's right to control Shatto. For example, Shatto executed a McLeod Regional form acknowledging that she was "perform[ing] my duties as an [sic] temporary employee of McLeod Health." Other McLeod Regional documents referred to Shatto as its temporary employee. Shatto was further provided a "new employee packet"

wherein it was agreed that Shatto was an employee at-will and that either Shatto or McLeod Regional could terminate the relationship "at any time for any reason."

Beyond the documentary evidence, McLeod Regional controlled Shatto from the smallest of things, such as where to park her car, to the carrying out of her important duties as a nurse anesthetist. We additionally note, as did the Commission, that Shatto began each work day by reporting to a McLeod Regional supervisor who directed her activities throughout the day.

McLeod Regional's response to this clear exercise of control over virtually every aspect of Shatto's duties as a nurse anesthetist is to invoke compliance with governmental regulations. According to McLeod Regional, because its control of Shatto was linked to regulatory requirements, a finding of an independent contractor relationship necessarily follows. We disagree. We find, moreover, that McLeod Regional's control over Shatto transcended mere regulatory compliance. For example, in terms of a dress code, McLeod Regional subjected Shatto to a dress code that was more stringent [4] than the legal requirement that she merely wear sterile clothing.

In addition, the Staffing Agreement gave McLeod Regional the "sole discretion" to determine whether Shatto's work was satisfactory and appropriate. While the law does impose certain requirements on one serving as a medical professional in a hospital, the facts clearly demonstrate that McLeod Regional had the *right* to exercise more control than required by law, and actually did exercise such control.

In any event, McLeod Regional fundamentally misconstrues this Court's language in *Wilkinson* concerning the applicability of governmental regulations in evaluating the right to exercise control factor. The presence of governmental regulations neither mandates nor forecloses a finding of an independent contractor relationship. Regulations such as the ones at

---

4. Ms. Williams–Blake, the Director of Occupational Health at McLeod Regional, testified at the Commission that McLeod had a dress code that required female employees to "wear uniforms, dresses, suits, or coordinated blouse/slacks outfits suitable for a business medical environment." Williams–Blake further testified that this dress code was an individual policy of McLeod Regional, not a policy required by law.

issue in *Wilkinson* and in this case are not outcome determinative on the employment versus independent contractor question. Regulatory compliance, by itself, is more properly viewed in a neutral manner, one that does "not necessarily support a conclusion of employment status." *Wilkinson*, 382 S.C. at 302, 676 S.E.2d at 703 (quoting *Universal Am–Can, Ltd. v. Workers' Comp. Appeal Bd.*, 563 Pa. 480, 494, 762 A.2d 328, 335 (2000)).[5]

McLeod Regional's exercise of control over virtually every facet of Shatto's duties as a nurse anesthetist was so pervasive that we conclude the factor of direct evidence of the right or exercise of control supports a finding of an employment relationship.

### Furnishing of Equipment

We find that McLeod Regional's furnishing of equipment for Shatto to use while on the job favors a finding of employment. "When it is the employer who furnishes the equipment, the inference of right of control is a matter of common sense and business." 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 61.07[2] (2013). The facts clearly demonstrate that McLeod Regional provided Shatto

---

5. In *Wilkinson*, we cited to the Code of Federal Regulations to demonstrate that compliance with the federal law concerning motor carriers was not " 'intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee.' " *Wilkinson*, 382 S.C. at 305–06, 676 S.E.2d at 705 (quoting 49 C.F.R. § 376.12(c)(4) (2008)). We concluded by quoting a decision of the Surface Transportation Board:

 While most courts have correctly interpreted the appropriate scope of the control regulation and have held that the type of control required by the regulation does not affect "employment" status, it has been shown here that some courts and State workers' compensation and employment agencies have relied on our current control regulation and have held the language to be prima facie evidence of an employer-employee relationship. . . .

 We conclude that adopting the proposed amendment will reinforce our view of the neutral effect of the control regulation and place our stated view squarely before any court or agency asked to interpret the regulation's impact. . . . By presenting a clear statement of the neutrality of the regulation, we hope to bring a halt to erroneous assertions about the effect and intent of the control regulation, saving both the factfinders and the carriers time and expense.

 *Id.* at 306, 676 S.E.2d at 705 (quoting Petition to Amend Lease and Interchange of Vehicle Regulations, 8 I.C.C.2d 669, 671 (1992)).

with everything that she needed to work, including medical equipment, hospital supplies, and sterile clothing. To the extent McLeod Regional again invokes "regulatory compliance" (in maintaining its equipment in working order) as a basis for this factor to support a finding of an independent contractor, such argument is summarily rejected as manifestly without merit. The furnishing of equipment factor supports a finding of employment.

## Method of Payment

"Payment on a time basis is a strong indication of the status of employment," while "[p]ayment on a completed project basis is indicative of independent contractor status." *Id.* § 61.06. Although Shatto was paid on an hourly or time basis, we find that the method of payment factor preponderates in favor of finding an independent contractor relationship.

Two contracts were involved, the Provider Agreement between Staff Care and Shatto and the Staffing Agreement between Staff Care and McLeod Regional. The evidence revealed that Staff Care, not McLeod Regional, paid Shatto. Staff Care paid Shatto at the rate of $95 per hour by direct deposit into her account. In addition, Staff Care provided Shatto a per diem, malpractice insurance coverage, a rental car, and housing during tenure at McLeod Regional. Conversely, McLeod Regional did not supply Shatto with insurance, vacation days, sick days, or a retirement plan—benefits that are available to other employees directly employed by McLeod Regional. In exchange for Staff Care's placement of Shatto with McLeod Regional, McLeod Regional paid a negotiated contract price to Staff Care. At no point during her employment did Shatto receive remuneration or benefits directly from McLeod Regional.[6] Thus, because the method of payment factor points to an independent contractor relationship, the court of appeals properly found that this factor did not support a finding of an employment relationship between Shatto and McLeod Regional.

---

6. The Staffing Agreement between Staff Care and McLeod Regional "acknowledge[d] that [Shatto] is not an employee of [Staff Care], [and] the relationship of [Shatto] to [Staff Care] is that of an independent contractor...."

## Right to Fire

This factor is often the most problematic, for a putative employer generally has the ability to terminate both employees and independent contractors. To the extent this factor carries any sway here, we find it tends to support the finding of an employment relationship.

"The power to fire, it is often said, is the power to control. The absolute right to terminate the relationship without liability is not consistent with the concept of independent contract, under which the contractor should have the legal right to complete the project...." *Id.* § 61.08[1]. The Provider Agreement between Staff Care and Shatto addressed the right of termination and referenced the ability of McLeod Regional to terminate Shatto although it was not a party to the agreement. Section 3.02(a) provided that: "Either party may terminate this Agreement and [Shatto] or [McLeod Regional] may terminate an assignment with or without cause by giving at least thirty (30) days prior written notice; provided, however, Staff Care shall not have the right to terminate an assignment for [McLeod] for which [Shatto] is performing services." Notwithstanding the thirty-day notice requirement, section 3.02(d) of the Provider Agreement stated, "[McLeod Regional], at its sole discretion, will have the right to terminate the services of [Shatto] for any assignment if [McLeod Regional] does not reasonably find the services of [Shatto] to be appropriate...."

The court of appeals read these sections in conjunction with section C.3 the Staffing Agreement[7] as somehow limiting

---

7. Section C.3 of the Staffing Agreement states:

If, at any time during the course of this AGREEMENT ... [McLeod Regional] does not reasonably find the performance of [Shatto] to be appropriate, [McLeod Regional] shall provide written notice of such determination to [Staff Care] and [Staff Care] shall attempt to replace [Shatto]. *[McLeod Regional] shall be solely responsible for terminating [Shatto] due to [her] poor performance, including, but not limited to intentional or unintentional dereliction of duties, gross negligence, or loss of hospital privileges, as determined by [McLeod Regional] in its sole discretion.* [McLeod Regional] may request that [Staff Care] on [McLeod Regional's] behalf deliver a notice of termination to [Shatto], but under no circumstances shall [Staff Care] have the unilateral right or authority to terminate [Shatto's] assignment.

(emphasis added).

McLeod Regional's right of termination. *Shatto*, 394 S.C. at 566, 716 S.E.2d at 454. This was error, for the contractual language granted McLeod Regional the right to terminate Shatto's employment if her work were deemed unsatisfactory. While McLeod Regional was required to follow specific contractual steps to properly terminate Shatto, this does not vitiate its right to terminate Shatto. The fact remains that McLeod Regional had the right to determine whether Shatto's work was satisfactory and the right to terminate that working relationship if it was not satisfied. Moreover, as noted above, Shatto executed at McLeod Regional's insistence a series of employer-employee related documents, including Shatto's acknowledgement of an employment at-will relationship. While not a significant factor in the analysis, the totality of these circumstances is sufficient for the "right to fire" factor to support a finding of an employment relationship between Shatto and McLeod Regional.

## III.

## CONCLUSION

■ In sum, we find that the evidence preponderates in favor of an employer-employee relationship between McLeod Regional and Shatto. McLeod Regional exercised actual direct control over Shatto's work, provided all of the equipment Shatto needed to do her job, and had the right to terminate Shatto's employment if her work was unsatisfactory. For these reasons, the court of appeals erred in reversing the Commission. We reverse the court of appeals and find that Shatto was an employee of McLeod Regional. We remand the case to the court of appeals to address the additional issue of whether Shatto's fall was idiopathic in nature, which was raised by McLeod Regional in its brief to the court of appeals.

**REVERSED AND REMANDED.**

TOAL, C.J., PLEICONES, and BEATTY, JJ., concur.

HEARN, J., concurring in result only.